**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THERESA J. IVINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 12-11460-TSH |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR ORDER REVERSING DECISION OF COMMISSIONER (Docket No. 21) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (Docket No. 27)**
**November 15, 2013**

**HILLMAN, D.J.**

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner") denying Theresa J. Ivins' ("Plaintiff") application for Social Security Disability Insurance benefits ("DIB"). Plaintiff filed a motion seeking an order reversing the decision of the Commissioner (Docket No. 21), and the Commissioner filed a cross-motion seeking an order affirming the decision of the Commissioner (Docket No. 27). For the reasons stated below, Plaintiff's motion is denied, and the Commissioner's motion is granted.

**Procedural History**

Plaintiff filed an application for a DIB on July 18, 2003, originally claiming she became disabled December 30, 1988 and later amending this date to January 1, 1994, due to shoulder,

1

back, neck, and pelvic impairments. (R. 79-80, 376-378).[1] The Social Security Administration ("SSA") initially denied Plaintiff's application on August 21, 2003, and denied it again upon reconsideration on October 20, 2003. (R. 55-56, 57-59, 64-66). On December 22, 2004 an Administrative Law Judge ("ALJ") issued a decision denying Plaintiff DIB. (R. 12-23). This Court vacated and remanded the ALJ's decision on February 28, 2007. (R. 351-70). On June 26, 2008 an ALJ issued a decision again denying Plaintiff's application. (R. 379-95). The Appeals Council vacated that decision and remanded the case. (R. 402-403). After a hearing in January 2010, ALJ Martinelli issued a decision on June 25, 2010 denying Plaintiff's claim. (R. 332-43, 702-35). The Appeals Council declined jurisdiction, and the June 2010 decision became the final decision of the Commissioner. (R. 321-23). Plaintiff now asks this Court to reverse that decision.

**Facts**

*Personal and Employment History*

Plaintiff was 38 on the date she claims she became disabled, January 1, 1994. (R. 79). Plaintiff last met the insured status requirements on June 30, 1994 ("Date last insured" or "DLI"), making the relevant time period for her disability January 1 through June 30, 1994. (R. 337). Plaintiff has a seventh grade education. (R. 95). Her work history includes employment as a wood worker, picker, paper folder, and bartender. (R. 104, 108).

*Medical History*

In May 1988 Plaintiff injured her right leg, including her right knee, pushing a load of material while working at a table manufacturing company. (R. 83, 249). Plaintiff saw Dr. Donald Mruk in June 1988 for this injury. (R. 249). Dr. Mruk found that while Plaintiff had

---

[1] A copy of the Administrative Record ("R.") has been provided to the Court under seal (Docket No. 18).

tenderness in her right knee, the function appeared intact. (R. 249). He noted that Plaintiff resumed light work on June 10, 1988, though he was unsure when Plaintiff would be able to resume regular work. (R. 249).

Plaintiff saw Dr. Norman Pike in August 1988 and September 1988 due to pain in her right leg. (R. 281). Dr. Pike noted that both examinations were unremarkable. (R. 281). Dr. Pike determined that Plaintiff had full strength in her leg except for weakness in her rectus femorus muscle and believed she had a severe strain with disruption of this muscle. (R. 250, 281). He also found Plaintiff had full range of motion in her hips, knees, and ankles. (R. 250). Plaintiff's discomfort improved from the August visit to the September visit. (R. 281). Dr. Pike did not see any reason Plaintiff could not return to work, noting that she appeared to be in good strength and only had discomfort at the end of the day, but told Plaintiff to contact him if she did return to work and could not perform. (R. 281). Dr. Pike believed Plaintiff would always have some discomfort due to her injury. (R. 250).

Also in September 1988, Plaintiff complained off right arm pain that radiated to her neck and the back of her head which she attributed to a work accident in August 1988. (R. 142). She was diagnosed with a shoulder sprain, and by the end of September the shoulder area was significantly less tender. (R. 142-43).

In May 1989 Plaintiff saw Dr. T.S. Echeverria due to continued pain and swelling in her right thigh from her work injury in May 1988. (R. 282). Dr. Echeverria found that Plaintiff walked with a normal gait and posture and had full range of motion of both hips and knees. (R. 282). Plaintiff had no areas of tenderness around the right quadriceps or hamstring area. (R. 282). Dr. Echeverria recommended Plaintiff return to work at either light duty or a part-time position and gradually increase her hours to rebuild her endurance. (R. 282). In August 1989

Plaintiff saw Dr. Echeverria again, reporting the pain had gone down to her knee. (R. 283). Dr. Echeverria recommended Plaintiff avoid flexed knee activities and again recommended Plaintiff return to work at light duty or part-time initially. (R. 283).

Plaintiff saw Dr. Mruk in August 1989 as well. (R. 145). Plaintiff told Dr. Mruk she continued to have pain in her right knee that worsened with activity. (R. 145). Dr. Mruk stated that Plaintiff could probably work 20 hours per week, and if she could not, he would recommend a work hardening program. (R. 145). Dr. Mruk explained that the length of Plaintiff's pain disability depended on her symptoms. (R. 145).

In October 1989, Plaintiff was referred to Dr. Osama Al-Masri who determined that arthroscopic surgery would be worthwhile because Plaintiff's pain had continued for over a year despite physical therapy and medication. (R. 138). He believed Plaintiff had chrondomalacia of the patella. (R. 138). Dr. Al-Masri performed the surgery on November 22, 1989. (R. 319). During a follow up visit in February 1990, Dr. Al-Masri noted that Plaintiff still had discomfort in her knee, especially when squatting, kneeling, climbing and descending stairs. (R. 319). Dr. Al-Masri recommended her job be modified to lessen those activities. (R. 319). He added that the prognosis for chrondomalacia of the patella is usually guarded due to the possibility of persisting or recurring symptoms. (R. 319).

Plaintiff saw Dr. Richard Hawkins in February 1990. (R. 252). Plaintiff told Dr. Hawkins that she felt somewhat better following the surgery. (R. 252). Dr. Hawkins found that Plaintiff responded to the surgery and that there were "little if any objective findings to support her complaints" of pain. (R. 253). In Dr. Hawkins' opinion, Plaintiff was capable of returning to work. (R. 253). Dr. Hawkins recommended that Plaintiff start with light work for four hours a day, but that she would be able to return to unrestricted work within four weeks. (R. 253).

Dr. Anthony Caprio saw Plaintiff in September 1990. (R. 254). He opined that she should be capable of returning to her regular work. (R. 254). Dr. Caprio again saw Plaintiff in March 1991. (R. 254). Plaintiff reported episodes of soreness in her thigh not related to any activity. (R. 254). Dr. Caprio examined Plaintiff, including both her upper and lower extremities, and found no orthopedic reason Plaintiff would be unable to return to her former occupation. (R. 255). He noted that no further treatment was needed, and that Plaintiff's complaints were more subjective with little objective treatment findings. (R. 255-56). Dr. Caprio concluded that Plaintiff should be able to return to her occupation and daily living, noting that Plaintiff had been able to take care of her daughter who had recently undergone surgery for ovarian cancer. (R. 256).

A medical report from Dr. Spear in August 1991 stated that Plaintiff could return to her regular job. (R. 83). A medical report from Dr. Al-Masri in December 1991 stated that Plaintiff could return to light work. (R. 83).

In March 2002 Plaintiff saw Dr. Jeffrey Hayer, complaining of persistent discomfort in her right shoulder. (R. 229). At the time, Plaintiff was a full-time babysitter for her grandson. (R. 229). Dr. Hayer ordered an MRI of the shoulder which was conducted later that month. (R. 229, 232). The MRI showed probable tendinitis and AC degenerative changes, and suggested impingement syndrome. (R. 232). Dr. Hayer diagnosed Plaintiff with AC joint arthritis of the shoulder. (R. 176). In April 2002 Plaintiff reported feeling less pain and discomfort. (R. 176).

In December 2002 Plaintiff saw Paul Kowacki, a chiropractor, complaining of right shoulder pain and headaches that had lasted a year, as well as the inability to elevate her right arm. (R. 277). Plaintiff saw Dr. William Callahan in January 2003, complaining of right shoulder and arm pain that had lasted two months. (R. 270). Plaintiff's physical therapy

evaluation found in January 2003 that the objective evidence was consistent the impingement of the right shoulder with weakness in R-C and scapular stabilizers. (R. 158).

When Plaintiff saw Mr. Kowacki again in February 2003 she could move her arm without difficulty. (R. 278). An examination by Dr. Hayer in April 2003 also showed Plaintiff had functional range of motion of her shoulder. (R. 176). An MRI and x-rays taken in April 2003 showed some issues with Plaintiff's cervical spine. (R. 150-51, 156).

That same month the University of Massachusetts Medical School Disability Evaluation Services ("MDES") performed a disability determination review. (R. 204-226). MDES found Plaintiff had the following impairments: right arm pain and headaches. (R. 204). MDES found that Plaintiff's impairments limited her ability to lift and either had lasted or could be expected to last 12 months or result in death. (R. 207, 208). MDES noted that the shoulder pain resulted from a fall 7-8 years before. (R. 208). MDES found Plaintiff's impairments did not meet or equal the SSI or DTA listings. (R. 209). Plaintiff had a physical examination as part of the review that showed Plaintiff did not have any physical limitations that would interfere with her ability to do work. (R. 210, 215-16). Examination of her shoulder showed Plaintiff had no localized tenderness. (R. 216). Plaintiff told MDES she still went out to shop for food, did chores around the house including cooking, laundry, dusting, bed making, vacuuming, and emptying the trash, and sometimes mowed the lawn with help. (R. 222). She also reported that she could sit, stand, walk, bend, reach, lift, and use her hands without help, and did so all the time. (R. 222). Plaintiff also stated that she could still drive. (R. 222). MDES concluded that Plaintiff did not have any limitations that would prevent her from doing any activities while working. (R. 215-16).

Plaintiff saw Dr. Daniel Jacome in May 2003 with neck pain and right arm pain and

numbness that Plaintiff stated she had experienced periodically for 15 years. (R. 152). An examination of Plaintiff showed tenderness upon palpitation of the right shoulder and cervical muscles on the right side, but was otherwise normal. (R. 154). An EMG/NCV of the right arm was normal. (R. 154-55). Plaintiff also saw Dr. Richard Brown in May 2003. (R. 233). Dr. Brown noted that Plaintiff had problems on her right side ever since she fell a few years ago and that Plaintiff complained especially of right shoulder and neck pain over the last couple of years. (R. 233). Dr. Brown's examination of Plaintiff was normal, with normal shoulder movement and mildly diminished cervical spine movement. (R. 233).

In July 2003 Dr. Christopher Comey, who had evaluated Plaintiff, noted that Plaintiff suffered from severe right sided neck pain and had a long history of neck and arm pain. (R. 182). Plaintiff had difficulty raising her arms at the shoulders due to neck pain. (R. 182). Plaintiff also had some numbness and "incoordination" of the right leg at this time. (R. 182). Dr. Comey found Plaintiff could lift 10 pounds occasionally and less than ten pounds frequently. (R. 184). In August 2003 Plaintiff saw Dr. Richard Anderson complaining of neck pain with right arm pain, right hand cramping, and headaches. (R. 187). Plaintiff told Dr. Anderson that the neck pain began 15 years before but became more constant over the previous year. (R. 187). Dr. Anderson found Plaintiff's neck to be mildly tender and noted that she did not have full range of motion. (R. 188).

Several doctors made RFC assessments for the time period relevant to Plaintiff's DIB claim. Dr. Avad Ramachandra completed such an evaluation on October 17, 2003. (R. 196). This assessment considered the primary diagnosis of back and neck pain and the secondary diagnosis of right knee pain. (R. 189). Dr. Ramachandra concluded that, during the relevant time period, Plaintiff could lift 20 pound occasionally and 10 pound frequently, could stand or

walk for six hours a day, could sit for six hours a day, was unlimited in her ability to push and pull, could balance and stoop frequently, and could climb, kneel, crouch, and crawl occasionally. (R. 190-91). Dr. Ramachandra found Plaintiff's symptoms were attributable to a medically determinable impairment. (R. 194).

Dr. Callahan completed an RFC worksheet in November 2003. (R. 198). Dr. Callahan found that Plaintiff could lift less than 10 pounds occasionally, could stand or walk for less than two hours, could sit for two hours, was limited in her ability to push or pull in both her upper and lower extremities, could never stoop, could occasionally balance, and could frequently climb stairs, crouch, and kneel. (R. 198). Dr. Callahan concluded that Plaintiff was limited in her ability to perform basis work activities, noting that she would only walk, lift, reach, stand, push, pull, or use her hands and fingers for 10 to 20 minutes at a time. (R. 200). Dr. Callahan cited Plaintiff's statements as the basis for many of his conclusions. (R. 198-99). In September 2004, Dr. Callahan again noted Plaintiff's limitations, this time opining that Plaintiff could only lift 2-5 pounds, could only stand, walk, or sit for 20 to 30 minutes, could not push or pull, and could never climb, balance, kneel, crouch, crawl, or stoop. (297-98).

In October 2004 Dr. Frank Graf wrote a letter regarding Plaintiff's DIB eligibility based on Plaintiff's statements, her medical record, and a physical examination. (R. 301-4). Dr. Graf concluded that Plaintiff met or exceeded the criteria for listing 1.04 Disorders of the Spine, and that she had problems affecting her right shoulder joint and right knee which limited her ability to engage in activities requiring pushing, pulling, carrying, bending, stooping, or lifting. (R. 304). Dr. Graf found that Plaintiff was due to her neck and shoulder problems in 1994. (R. 304).

In November 2004 Dr. Callahan wrote a letter explaining that Plaintiff's work injuries in 1988 and 1989 led to pain, weakness, and numbness in her right hand, shoulder, and neck, and

8

numbness in her right knee. (R. 305). The letter states that Plaintiff has been unable to hold a job because she cannot stand, walk, carry, or reach for more than 10 to 15 minutes at a time. (R. 305). Dr. Callahan noted that multiple MRI's confirm her disease state and that Plaintiff has received several diagnoses regarding problems with her spine, shoulder, and knee. (R. 305).

In 2006 additional MRIs show continuing issues with Plaintiff's spine. (R. 467-63, 492). After examining some of Plaintiff's MRIs, Dr. Uma Raghunathan noted that she did not think Plaintiff's pain and symptoms were secondary to her cervical spine issues. (R. 530).

In January 2008 Dr Callahan gave an opinion to the SSA regarding Plaintiffs ability to do work-related activities. (R. 484). Dr. Callahan opined that Plaintiff's lifting, carrying, standing, walking, pushing and pulling were all affected by Plaintiff's impairment. (R. 484-85). Dr. Callahan also noted that Plaintiff's impairments cause some postural and manipulative limitations and compromise Plaintiff's ability to maintain attention or concentrate. (R. 485-86). Dr. Callahan cited Plaintiff's cervical spine disease as support for these conclusions, as well as the pain in Plaintiff's right arm and leg. (R. 485-86).

In February 2008 Dr. Callahan wrote a letter explaining his views regarding Plaintiff's limitations during the relevant time period. (R. 669). Plaintiff became Dr. Callahan's patient in 1993, originally seeing him for gynecological care, though Dr. Callahan later came to act as Plaintiff's primary care physician. (R. 669). Dr Callahan noted that he noticed Plaintiff's back and leg issues in 1993 but did not take any formal history on them. (R. 669). He explained that Plaintiff lacked health insurance and did not seek medical attention to avoid running up medical bills. (R. 669). Plaintiff told Dr. Callahan that the doctors she did see for her work related injuries focused on her leg, rather than her neck, shoulder, arm, and back, because that was the issue in her worker's compensation claim. (R. 669). Dr. Callahan believed that in 1993 Plaintiff

could have worked 20 hours per work in job with little walking, standing, or use of her right arm or shoulder. (R. 669-70). Dr. Callahan thought Plaintiff's shoulder, arm, neck, and back problems did not received the proper medical attention when they began. (R. 670). Dr. Callahan agreed with Dr. Graf's assessment of Plaintiff's limitations. (R. 670). Dr. Callahan stated that while Plaintiff's limitations were not as severe in 1993 and 1994 as they were presently, he still believed that Plaintiff was too physically impaired in 1994 to do any full time work. (R. 670).

Dr. Louis Fuchs responded to a medical interrogatory for Plaintiff's DIB case which asked for his opinion on Plaintiff's physical impairment(s) for the period from January 1, 1994 through June 30, 1994. (R. 671). Dr. Fuchs reviewed the evidence in the case and concluded there was insufficient evidence to permit him to form an opinion about the nature and severity of Plaintiff's impairments during the relevant period. (R. 671). Specifically, Dr. Fuchs stated that he would need medical records from that time period to form an opinion. (R. 671).

*The ALJ's Findings*

To be found eligible for DIB, an applicant must prove that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). When determining whether an applicant meets this standard, the Commissioner uses a "five-step sequential evaluation process." 20 C.F.R. § 404.1520 (a)(4). This process requires the Commissioner to decide (1) whether the applicant is engaged is substantial gainful activity; if not (2) whether the applicant has a severe medical impairment; if so (3) whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1; if not (4) whether the applicants RFC allows her to perform her past relevant work;

and, if not (5) whether, considering the applicant's RFC, age, education, and work experience, the applicant could make an adjustment to other work. *Id*. Any jobs that an applicant could adjust to must exist in significant numbers in the national economy. 20 C.F.R. § 404.1560.

After considering the record, the ALJ found that the Plaintiff's DLI was June 30, 1994 and that Plaintiff did not engage in substantial gainful activity between the onset date of January 1, 1994 and the DLI. (R. 337). Further, the ALJ found that during the relevant time period, January 1, 1994 through June 30, 1994, the Plaintiff had the following severe impairments: a remote history of right shoulder injury/strain and right internal derangement/chondromalacia of the patella. (R. 337). The ALJ noted that the bulk of the evidence relating to Plaintiff's neck and shoulder problems is from well after the relevant time period. (R. 337-38). The ALJ found that through the DLI the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Part 404 Subpart P, Appendix 1. (R. 338). While Plaintiff's orthopedic surgeon Dr. Graf opined in 2004 that Plaintiff did meet the requirements of Listing 1.04, the ALJ gave this opinion "essentially no weight," because the opinion lacked objective evidence for the relevant time period. (R. 338).

The ALJ found that through the DLI, Plaintiff had the residual functional capacity ("RFC") to perform a limited range of light work, as defined in 20 CFR 404.1567(b). (R. 339). In making this finding, the ALJ gave some weight to the state agency assessment, noting that the assessment appropriately considered the medical evidence from the appropriate time period. (R. 340). The ALJ found the Plaintiff's testimony about the intensity, persistence, and limiting effects of the symptoms of her impairments not credible to the extent it was inconsistent with the aforementioned assessment. (R. 340). Again, the ALJ gave little weight to Dr. Graf's opinion from 2004, and noted that Plaintiff's treating physicians from the relevant time period, such as

Dr. Mruk, Dr. Pike, and Dr, Echeverria all stated that Plaintiff should be able to return to work. (R. 341). The ALJ found that during the relevant period the Plaintiff was unable to perform any past relevant work, noting that past relevant work included employment as a wood worker and bartender. (R. 341). The ALJ found that Plaintiff was, at the relevant time, a "younger individual age 18-49" with limited education and able to communicate in English. (R. 342). The ALJ found that, considering the above factors and the testimony of a vocational expert ("VE"), there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed. (R. 342-43). Therefore, the ALJ concluded that Plaintiff was not under a disability during the time period in question, January 1, 1994 through June 30, 1994.

## Discussion

Plaintiff argues the Commissioner's decision should be reversed because the ALJ substituted his lay opinion for the opinion of medical professionals, the ALJ did not give the proper weight to the opinions of Plaintiff's treating physician Dr. Callahan, and the record did not substantially support the ALJ's finding at Step Five of the evaluation.

*Standard of Review*

Review by this Court is limited to whether the Commissioner's findings are supported by substantial evidence and whether she applied the correct legal standards. *Manso-Pizarro v. Sec'y of Heath & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When applying the substantial evidence standard, the court must bear in mind that it is the province of the Commissioner to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts about the evidence. *Irlanda*

*Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Reversal of an ALJ's decision by this court is warranted only if the ALJ made a legal error in deciding the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Comm'r of Social Security*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizzaro*, 76 F.3d at 16.  If the Commissioner's decision is supported by substantial evidence, it must be upheld even if the record could arguably support a different conclusion.  *Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

*The ALJ's Lay Opinion*

Plaintiff argues the ALJ's decision should be reversed because the ALJ made his RFC determination based on his own lay judgment without substantial support from the record. Specifically, Plaintiff claims the ALJ's RFC finding is inconsistent with all of the medical opinions on the record. First, Plaintiff faults the ALJ's citation to Dr. Fuch's conclusion that he could not assess the nature and severity of Plaintiff's impairments based on the record.  (R. 338-39).  Dr. Fuch's assessment is relevant because Plaintiff bears the burden of proving she was disabled during the relevant time period.  20 C.F.R. § 404.1512(c) ("You [claimant] must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled."); *see Vazquez v. Sec'y of Health & Human Servs.*, 683 F.2d 1, 2 (1st Cir. 1982).  The ALJ did not use Dr. Fuch's response to support his RFC finding, rather he cited it to show the lack of evidence on the record supporting Plaintiff's disability claim.

Plaintiff next suggests that the ALJ's RFC finding is inconsistent with the RFC assessments completed by Dr. Ramachandra, a state agency physician, which the ALJ cites for support. An ALJ does is not required to accept a single medical opinion in its entirety, but can

"piece together the relevant medical facts from the findings and opinions of multiple physicians." *Evangelista*, 826 F.2d at 144. The ALJ acknowledged Dr. Ramachandra's inclusion of postural limitations in his October 2003 assessment, but declined to explicitly include them in his RFC finding. (R. 339-41). Plaintiff also asserts that the ALJ failed to include the limitations found by Dr. Al-Masri, which were present while Plaintiff recovered from surgery and which Dr. Masri believed could persist. (R. 319). The ALJ explained this decision, noting that these limitations were present four years before the relevant time period, and by 1994 Plaintiff needed only over the counter medication for pain. (R. 341).

The postural limitations found by Dr. Ramachandra and Dr. Al-Masri, specifically the limitation of only occasional kneeling, crouching, and crawling, leave the light occupational base "virtually intact," while the occasional climbing limitation would not have a significant impact on the light occupations. Social Security Ruling 85-14, 1985 WL 56857, *6-7. Moreover, neither doctor found Plaintiff could never perform such activities; they noted these activities could only be done occasionally or should be lessened. (R. 190-91, 319). Dr. Al-Masri, considering Plaintiff's possible limitations, concluded in 1991 that Plaintiff could return to light work. (R. 83). Therefore the ALJ's finding that Plaintiff could perform a limited range of light work is supported by Dr. Ramachandra and Dr. Al-Masri's assessments. (R. 339).

The MDES assessment, completed nine years after the DLI, concludes Plaintiff has no physical limitations. (R. 204-26). The ALJ does not rely on this assessment to support his findings of specific limitations, but cites it only as support for the finding that Plaintiff could have worked during the relevant time period. (R. 340).

Plaintiff takes issue with the ALJ's characterization of the reports from Dr. Mruk, Dr. Pike, and Dr. Echeverria, three of Plaintiff's treating physicians she saw around the time of her

injuries. Specifically, Plaintiff disagreed with the ALJ's statement that each of these physicians believed Plaintiff should be able to return to work. (R. 341). This argument was rejected in a prior decision regarding Plaintiff's case, and this Court agrees. (R. 363-64). As Judge Saylor previously noted, the statements by each of these physicians could support the ALJs statement, and therefore it is not a reversible error. (R. 363-64). Dr. Mruk's belief in early 1988 that Plaintiff would be able to work in June 1988 and that Plaintiff had already resumed light work support the finding that Dr. Mruk thought Plaintiff should be able to work. (R. 249). Dr. Pike thought Plaintiff would have discomfort, possibly indefinitely, but clearly stated that he saw no reason Plaintiff could not go back to work. (R. 250, 281). Discomfort or even pain do not necessarily make one disabled. *Prince v. Astrue*, 490 F. App'x 399, 400 (2d Cir. 2013) ("disability requires more than mere inability to work without pain"). Finally, the ALJ could make the inference from Dr. Echevarria's opinion that Plaintiff could return to work on light duty or part time initially, gradually increasing her endurance, that Dr. Echevarria believed Plaintiff could eventually return to full time work. (R. 282). These reports provide enough evidence to justify the ALJ's conclusion that these physicians believed Plaintiff could return to work.

Plaintiff claims the ALJ erred in giving little to no weight to Dr. Graf's evaluation that Plaintiff's back and neck issues became disabling in 1994. Dr. Graf did not examine Plaintiff until ten years after the DLI, and based his opinion on this examination, Plaintiff's statements, and a review of the medical record. (R. 311-314). The ALJ noted that nothing in Plaintiff's physical examinations before 2004 support this finding. (R. 341). Treating physicians are not entitled to controlling weight when their opinions are not consistent with the record as a whole or supported by the evidence. 20 C.F.R. 404.1527(c)(2). It is the province of the ALJ to resolve conflicts in the evidence. *Barrientos v. Sec'y of Health & Human Servs.,* 820 F.2d 1, 2 (1st Cir.

1987). Here, the ALJ properly exercised his discretion as Dr. Graf did not examine Plaintiff until well after the DLI and his assessment is unsupported by the record. *See Baer v. Astrue*, 2012 WL 3042946 (D. Me. July 2, 2012) (holding that inconsistency with record and the fact that treating physician did not examine claimant until two years after DLI were good reasons to accord little weight to treating physicians opinion).

Finally, Plaintiff argues the ALJ erred be rejecting the opinion of Dr. Callahan when making his RFC determination because Dr. Callahan was Plaintiff's only treating physician from January 1, 1994 to June 30, 1994. The ALJ noted that Dr. Callahan's RFC assessments were not supported by objective medical evidence. (R. 341). Although Dr. Callahan is a treating physician, the ALJ need not accord him controlling weight if the ALJ finds his opinion is not supported by or inconsistent with the record. 20 C.F.R. 202.1527(c)(2). Moreover, a treating physician's opinion may be given less weight if the physician did not treat the complained of impairment. 20 C.F.R. 202.1527(c)(2)(ii). Here, Dr. Callahan initially saw Plaintiff for gynecological care, and only later become her primary care physician. (R. 669). Indeed, he has no notes on Plaintiff's back, shoulder, arm, neck, or leg issues for the relevant time period and admits he was not involved in treating them during the relevant time period. (R. 669). Moreover, many of Dr. Callahan's opinions are based, at least in part, on medical evidence from long after the DLI, such as the MRIs taken in 2002 and 2003 and the cervical spine issues that were first documented in 2003. (R. 305). Given these facts, the ALJ was entitled to give Dr. Callahan's opinion less weight and did not commit reversible error by failing to adopt Dr. Callahan's opinion of Plaintiff's RFC.

Ultimately, the ALJ's RFC determination is substantially supported by the record. Several medical opinions, including those from treating sources, suggest that Plaintiff had the ability to

perform at least a limited range of light work and could lift ten pound occasionally and five pounds frequently, could stand or walk for 6 or more hours a day, and was limited to frequent reaching. In making this finding, the ALJ noted that Plaintiff had received two medical diagnoses before her DLI, a right shoulder strain and right knee chondromalacia. (R. 138, 142-43). Any other diagnoses came at least eight years after the DLI. The records from treating physicians, including those discussed above, that Plaintiff saw prior to the DLI show each one thought Plaintiff could resume at least light work. (R. 83, 145, 249, 253, 255 281, 319). RFC assessments completed by medical sources also support the ALJs finding. Dr. Ramachandra concluded that, during the relevant time period, Plaintiff could stand or walk for six hours a day, and could sit for six hours a day. (R. 190-91). Dr. Comey found Plaintiff could lift 10 pounds occasionally and less than ten pounds frequently at the time of his examination of Plaintiff in 2003. (R. 184). Plaintiff, by her own admission, reported taking only over the counter medication for pain. (R. 341). The ALJ also noted that Plaintiff did not use any assistive device for walking or provided no objective evidence showing any standing or walking limits that would prevent her from engaging in light work. (R. 341). Contrary to Plaintiff's assertion, then, there is ample medical evidence to support the ALJ's finding, and the ALJ sufficiently explained the weight given to contradicting evidence; therefore the ALJ did not render a lay opinion.

The ALJ was not required to seek additional expert medical advice, as there was substantial medical evidence on the record in this case. *See Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 5 (1st Cir. 1987) ("Use of a medical advisor in appropriate cases is a matter left to the Secretary's discretion; nothing in the Act or regulations requires it."). As shown above, there is substantial medical evidence on the record to support the ALJ's RFC finding.

*Weight Accorded to Treating Physicians*

Plaintiff next argues the ALJ's reasons for rejecting Dr. Callahan's RFC opinions are inadequate. Plaintiff claims the ALJ rejected Dr. Callahan's opinions because the record lacks treatment notes relating to Plaintiff's disabling limits during the time period. In support of her argument, Plaintiff cites *Soto-Cedeno v. Astrue*. 380 Fed.Appx. 1 (1st Cir. 2010). In *Soto-Cedeno*, the Court found that the lack of treatment notes did not justify rejecting the treating physician's opinion when the physician's report described specific observations of and tests administered to the Plaintiff during the period in question. *Id*. at 3. Moreover, the Court noted that the other reasons the ALJ rejected the treating physician's opinion were unsupported by the evidence. *Id*. at 3-4. In this case, Dr. Callahan's reports do not include such specific medical documentation or testing for the time period to make up for the lack of treatment notes; Dr. Callahan merely states that it was obvious to him that Plaintiff had back and leg issues in 1993, but that he did not take formal history or become actively involved in treating them. (R. 669). This lack of objective medical evidence from the time period, as well as the inconsistency of Dr. Callahan's findings with other treating physicians as explained above, are sufficient reasons for the ALJ to give little weight to Dr. Callahan's opinion. 20 C.F.R. 404.1527(c)(2). It is within the discretion of the ALJ to resolve such conflicts in the evidence. *See Barrientos,* 820 F.2d at 2.

Plaintiff then cites *Ormon v. Astrue*, arguing inconsistencies in the record are not enough to reject a treating physician's opinion. 496 Fed.Appx. 81, 85 (2012). In *Ormon*, the Court found that a single, poorly explained opinion was not enough to discount a treating physician's opinion "in a case involving complex back pain." *Id*. Here, there are multiple opinions of other treating physicians that contradict Dr. Callahan's assertions regarding Plaintiff's ability to work. Moreover, the applicability of *Ormon* appears to be limited to the specific medical situation of

18

that case. 496 Fed.Appx. at 85. Finally, the ALJ did not rely on the inconsistencies alone in giving Dr. Callahan's opinion little weight. He also cited the lack of corresponding treatment notes regarding the disability. These are both factors that can be considered in assessing the weight to be given to treating physicians. 20 C.F.R. 404.1527(c)(2). In sum, the ALJ gave sufficient reasons for rejecting the RFC assessment of Dr. Callahan that are supported by the evidence.

*The ALJ's Finding at Step Five*

Finally, Plaintiff argues the ALJ's finding at step five lacks substantial support because it relies on the testimony of a VE that was based on a faulty hypothetical question, again claiming the ALJ's RFC was not supported by the record. Testimony of a VE must be based on a hypothetical question that includes an RFC that is supported by the medical record. *See Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). As discussed above, the ALJ's RFC was based on substantial evidence; therefore the hypothetical question based on that RFC was valid and resulting testimony by the VE constituted legitimate substantial support for the ALJ's finding at Step Five.

## **Conclusion**

The ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's Motion for Order Reversing Decision of Commissioner is **denied**, and the Commissioner's Motion for Order Affirming Decision of Commissioner is **granted**.

SO ORDERED.

        /s/ *Timothy S. Hillman*
        **TIMOTHY S. HILLMAN**
        **UNITED STATES DISTRICT JUDGE**